UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**CAMP ZION, INC.,**

    Plaintiff,

  v.              Case No. 23-C-582

**DOOR COUNTY, et al.,**

    Defendants.

---

**DECISION AND ORDER GRANTING MOTION
FOR PARTIAL SUMMARY JUDGMENT**

---

  This case arises out of a zoning dispute between a Christian youth camp and the neighboring property-owners, with Door County caught in the middle. The dispute has a long history. Plaintiff Camp Zion, Inc. (the Camp), a not-for-profit charitable and religious organization which owns and operates a Christian youth camp located in Door County, claims that its efforts to replace its dated and inadequate dining hall with an up-to-date dining commons and fellowship center (the Center) has been thwarted, initially by the County's Resource Planning Committee and Zoning Board of Adjustment, but more recently by the neighboring landowners. In fact, construction of the Center is now essentially complete and in use, though the neighboring property owners have continued their opposition through a series of state court lawsuits in which they apparently seek to have the now completed Center demolished.

  The Camp filed this action, its second in this court against Door County, the County's Resource Planning Committee, and its Zoning Board of Adjustment (collectively, the County). The current lawsuit also names nearby property owners Michael Bahrke, Peter Orlik Revocable Trust, Artie Orlik Family Trust, Erik Peterson, Priscilla Peterson, James Maronek, and Heather

Passow (collectively, the Neighbors), alleging that their conduct violates the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc(a). As applicable here, RLUIPA prohibits a government agency from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). The County agrees with the Camp that preventing it from constructing the Center under local land use regulations would pose a substantial burden on the Camp's religious exercise and that doing so would not further any compelling governmental interest. It is the Neighbors, who under Wisconsin law have a right to challenge the issuance of zoning variances and conditional use permits (CUPs), who oppose the Camp's project.

In addition to RLUIPA, the Camp has asserted claims under the First and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 3, 4, and 18 of the Wisconsin Constitution. Using a "shotgun approach," the Camp asserts additional state-law claims for specific enforcement of a contract, breach of warranty, breach of settlement agreement, and recission of settlement agreement, and claims it is entitled to damages, attorneys' fees and costs, and declaratory and injunctive relief against the Neighbors, as well as the County. The court has jurisdiction over Camp Zion's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over its state-law claims pursuant to 28 U.S.C. § 1367.

In an effort to streamline the case, the parties agreed that the Camp would file a partial motion for summary judgment seeking only declaratory relief that the Camp has the right under federal law to construct and use the Center as designed at its current location and that this right to

2

construct and use the Center preempts any rights or claims of the Neighbors who oppose it. Dkt. No. 80. That motion, which the County has joined to the extent that the declaratory relief sought applies only to the Neighbors, is now fully briefed. For the reasons that follow, the motion will be granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the

non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## BACKGROUND

The Camp was founded in 1946 by Christ Community Church of Zion, Illinois, and was separately incorporated by the Church in 2017. It is licensed by the State of Wisconsin as a Recreational/Educational Camp. The Camp is a Christian youth camp ministry, organized to carry out the Church's religious mission providing Christ-centered outdoor experiences for children, youth and adults. A charter member of the Christian Camp & Conference Association, the Camp has operated continuously at its present location since its founding, offering year-round programming through which the Church serves its own attendees and guests, as well as other Christian ministries of like faith and practice. Dkt. No. 87, ¶¶ 1–2, 5.

The Camp, which consists of two parcels, is situated on the far northwestern tip of the Door County peninsula in the Town of Liberty Grove and overlooks Green Bay from a shoreline bluff which is part of a geologic formation known as the Niagara Escarpment that runs from New York through Ontario, Michigan, Wisconsin, and Illinois. *Id.* ¶ 5. The parcels, currently consisting of a 28.43-acre east parcel and a 2.95-acre west parcel, total 31.38 contiguous acres and are divided by a private section of Door Bluff Road, which runs north to south. *Id.* ¶ 6. Door Bluff Road is recorded as a platted easement for only part of the portion dividing Camp Zion's parcels; the platted easement begins in the middle of the western parcel's eastern border, going south, and there is a gap where no platted easement exists. *Id.* ¶¶ 63–66. The following panels show the location of the Camp on the Door County Peninsula (Panel 1) and the east and west parcels outlined in yellow (Panel 2) and then magnified (Panel 3):

4

Case 1:23-cv-00582-WCG    Filed 12/30/25    Page 4 of 20    Document 115



Panel 1    Panel 2    Panel 3

*Id.* ¶ 56.

Prior to the construction of the Center, all of the buildings utilized by the Camp were located on the smaller parcel on the west side of Door Bluff Road. These included the Camp offices, a lodge, dormitories, dining hall, and kitchen, together with multiple accessory recreational and service facilities. As a result, most of the Camp's programming and regular activities, such as eating and sleeping, were conducted on the west parcel. The larger parcel on the east side of Door Bluff Road consisted of a large playfield and wooded areas.

By the early 2000s, the dining hall, which had been constructed in 1984, could no longer accommodate the normal 110–125-person Camp attendance due to its age, accessibility requirements enacted as part of the 1990 Americans with Disabilities Act (ADA), changes in state occupancy regulations for dining facilities, and the higher expectations of those who attended the Camp. The Camp was also in need of a building where it could hold indoor large-group events and programming. *Id.* ¶ 18.

To meet its need, the Camp began a capital fundraising campaign and, beginning in the mid-2000s, the Camp consulted with engineering and architectural professionals to assist with its assessment and strategic planning for a new combined dining hall and conference center to be located on the east parcel, which even at that time was significantly larger than the west parcel but

5

smaller than it is now. *Id.* ¶¶ 20–21. Several provisions of the Door County Comprehensive Zoning Ordinance (DCCZO), Dkt. No. 70-1, are particularly relevant to the now completed structure. First, DCCZO § 3.05(4) provides a 30-foot private road setback for structures, which is measured from the relevant description in a plat or deed, if there is one, or from the travelled surface of the road if there is not. Second, DCCZO § 3.06 provides an additional "big building setback"—the larger the building volume, the greater the additional required setback. *Id.* Third, DCCZO §§ 3.06(4) and 3.10(4) reduce the total setback by 50% if suitable landscape buffers are planted screening the building. *Id.* And finally, DCCZO § 3.08 limits the height of the building to an average of 37 feet above pre-construction grade or an average of 35 feet above finish grade, whichever is lower. *Id.*

The Camp was initially told by County zoning staff that even though the east parcel was larger than the west, the Camp did not own enough land on the east parcel to construct a building with a 140-person capacity that would comply with the requirements of the County ordinance. Camp officials were told by the Senior and Assistance Zoning Administrators that the County's ordinance allowed additional non-conforming construction of such a facility on the west parcel and that construction at that location would present fewer difficulties with neighboring property owners. *Id.* ¶ 24.

In May 2015, the Camp filed an application for a CUP to permit construction of a two-story dining and meeting facility with a 140-person capacity on the west parcel, as recommended by the County zoning officials. The application was approved by the Liberty Grove Town Planning Commission, as well as the County's Resource Planning Committee. Bahrke and several other Neighbors appealed to the County Zoning Board of Adjustment, which overturned the Resource Planning Committee's decision and denied the application on six different grounds:

6

i) The Camp did not own enough land to meet the 5-person per acre limit under the 1995 Ordinance applied to the Camp's land as a whole;

ii) The project would expand use of the Single Family 30 zoned parcel;

iii) Door Bluff Lane was unpaved and might be too dusty with possible additional traffic related to increased occupancy and use;

iv) Building on the site would damage the Niagara Escarpment;

v) The building was too close (75 feet) to the nearest northern neighbor; and

vi) The building was too large for the area, with a footprint of 6,400 square feet.

*Id.* ¶¶ 26–28.

Over the more than eight years it had spent developing and seeking approval of its project, the Camp had expended more than $100,000 for professional fees and vendor services, which amounted to more than 25% of its annual budget. *Id.* ¶ 29. Over the next five years, the Camp spent an additional $400,000 developing a proposal to build the current Center on the west parcel. In response to the Board's stated reasons for denying its CUP application for the earlier project, the Camp took the following actions:

i) purchased 12 more acres at a cost over $125,000, bringing the east parcel to 28.43 acres and total campus acreage to 31.38, enough to meet the 5-person per acre Ordinance limit for 282 persons.

ii) sited the new Center on the larger east parcel which was zoned Heartland 3.5 (primarily residential but allows certain non-residential non-conforming uses), rather than the west parcel, which is zoned Single Family 30 (single family homes);

iii) chip-sealed both Door Bluff Road and Door Bluff Lane, a private road the Camp had built to reduce traffic on Door Bluff Road, thereby eliminating dust;

iv) sited the Center east of the Road, over 378 feet from the Niagara Escarpment on the Green Bay shoreline;

v) sited the Center over 260 feet from the nearest residential neighbor (who supports the Center Project); and

vi) reduced the footprint of the Center from 6,400 square feet to 6,137 square feet, which is less than 0.5 % of the total HL3.5 parcel area, is only 441 square feet larger than the 2001 Fireside Lodge (5,696 sq. ft.), and is the absolute minimum required to accommodate the Camp population in compliance with building codes, ADA requirements, and professional design standards.

*Id.* ¶ 30.

On March 9, 2020, the Camp filed two petitions for variances and a CUP application to construct the Center at the proposed location on the east parcel. The Center called for the building to be constructed in a drop-off from the Road with a footbridge over the drop-off to the upper level Center entrance to allow for ingress and egress by the disabled and elderly to comply with ADA requirements. *Id.* ¶ 31. Bahrke opposed the Camp's project, and following a hearing on the variance petitions, the Zoning Board of Adjustment denied the variance on July 14, 2020. *Id.* ¶ 32.

Under Wisconsin law, the Camp could have sought judicial review by filing a petition for certiorari in the Circuit Court for Door County. Wis. Stat. § 59.694(10). The Camp chose instead to file suit in this court on August 14, 2020, alleging, *inter alia*, that the Board's denial of its applications violated the Camp's rights under RLUIPA and the ADA. *See Camp Zion, Inc. v. Door County*, No. 1:20-cv-1248 (E.D. Wis.); Dkt. No. 87, ¶ 33. On October 1, 2021, the Camp's federal lawsuit against the County was dismissed on stipulation of the parties after they entered into a Settlement Agreement. Under the terms of the Settlement Agreement, which was not incorporated into the judgment, the County agreed to grant the Camp an exemption from variance and setback regulations and promptly issued a CUP and zoning permit to construct the Center at a location a short distance to the east of the proposed location. The Camp immediately began site preparation and construction. *Id.* ¶ 35.

On November 10, 2021, Bahrke and at least some of the Neighbors filed suit against the County in state court, alleging that the CUP was void because it was issued without a public

hearing as required under Wis. Stat. § 59.69(5e)(c) and Door County Zoning Ordinance §§ 11.04(3). *Bahrke v. Door County Bd. of Adjustment*, No. 21-CV-123 (Door Cnty., Wis.); Dkt. No. 87, ¶ 36. The complaint sought a writ of mandamus to require a variance for the project and certiorari review of the decisions exempting the project from variance requirements and approving the CUP. The County sought to remove the case to this court, but the court concluded that federal jurisdiction was lacking and remanded the case to the circuit court. *Bahrke v. Door County Bd. of Adjustment*, No. 1:21-cv-1375 (E.D. Wis.), Dkt. Nos. 24, 29.

Back in state court, the Neighbors prevailed on their claim for certiorari review of the County's decision to grant the Camp's application for the CUP. In an order entered on April 27, 2023, the circuit court concluded that the County had failed to comply with the relevant statutes and administrative procedure in granting the Camp's application for a CUP. The court therefore vacated the CUP and remanded the matter to the County with instructions that the County "follow the law for any building applications, variance applications and/or CUP applications." Dkt. No. 87, ¶¶ 37–38, Dkt. No. 1-4 at 2–3. The Wisconsin Court of Appeals affirmed the circuit court's decision in *State ex rel. Bahrke v. Door County Board of Adjustment*, No. 2023AP1309, 2024 WI App 74 (Oct. 15, 2024).

By the time the circuit court had entered its decision, the Camp had already spent over 18 months and $4.4 million constructing the Center. On May 4, 2023, the County notified the Camp that the 2021 permits for its project had been vacated and referred the Camp to Chapter 12 of the County Ordinances governing enforcement for ordinance violations and authorizing the issuance of forfeitures of up to $500 per day for each violation. The Camp nevertheless continued with construction, concluding that to stop at that point would result in catastrophic costs on the multi-million-dollar project. Dkt. No. 87, ¶¶ 38–39. Rather than commence legal action against the

Camp, the County informed the Camp in letters dated May 5 and 11, 2023, that it was prepared to re-process its application for a CUP pursuant to the Ordinance if the Camp wanted it to do so. In response, the Camp filed a new application for a CUP under protest on May 22, 2023. *Id.* ¶¶ 40, 43. In the meantime, on May 9, 2023, the Camp filed this action against the County defendants seeking declaratory and injunctive relief confirming its right to construct and use the facility under RLUIPA, as well as other provisions of federal and state law. On May 18, 2023, the Camp amended its complaint to add Bahrke and the other Neighbors who had challenged the County's previous decision granting its applications. *Id.* ¶¶ 41–42.

In mid-June 2023, the County Land Services Department issued a draft Staff Report, which addressed the Camp's claims under RLUIPA and the ADA and recommended approval of the Camp's new CUP application. The Report noted that in approving the location in the 2021 Settlement Agreement, the determination had been made that no variance from the private road setback requirements was necessary. A final version of the Staff Report was later included in the materials submitted to the Resource Planning Committee and Zoning Board of Adjustment for their upcoming hearings on the Camp's new application. *Id.* ¶ 44.

On June 20, 2023, Bahrke, along with several Neighbors, filed another lawsuit against the Camp in state court, with the County named as an involuntary plaintiff, in which they sought an injunction to halt construction and the imposition of forfeitures "on behalf of Door County." *Id.* ¶ 45. The Camp appeared specially and asked the court to require the plaintiffs to post a statutory bond and dismiss or stay the case in light of the Camp's pending case in this court. The state court took the Camp's motions under advisement but later denied the plaintiffs' motion for a preliminary injunction halting construction because doing so "would just create substantial interruption and

burden on Camp Zion." *Id.* ¶ 48.  The court later stayed the case before it pending this court's disposition of this action.  *Id.* ¶¶ 46, 48, 53.

On July 14, 2023, the Town of Liberty Grove Plan Commission conducted a public hearing to consider whether it would recommend that the County grant the Camp's new application.  In the course of the hearing, Bahrke repeated his previous complaints about the Camp's possible future growth and vowed that they were "going to the mat" to stop the project.  Bahrke's wife claimed the Camp was contemplating a mini golf course, a waterslide, and a helipad.  The Town Plan Commission declined to make any recommendation.  *Id.* ¶ 47.

The County Resource Planning Committee conducted a public hearing on the Camp's new CUP application on August 10, 2023, at which the Neighbors appeared in opposition.  The Committee reconvened and approved the Camp's application on August 31, 2023, and issued its written decision on September 11, 2023.  *Id.* ¶¶ 49, 51.  Bahrke appealed the Committee's decision to the County's Zoning Board of Adjustment on October 11, 2023, and on December 12, 2023, the Board conducted a hearing, denied Bahrke's appeal, and voted to approve the CUP application. *Id.* ¶ 52.  The Board issued a written decision on January 9, 2024.  *Id.* ¶ 54.

On February 8, 2024, Bahrke and two other Neighbors filed a third lawsuit in state court, this time seeking *certiorari* of the Board's decision to grant the Camp's second CUP application. *Bahrke v. Door County Bd. of Adjustment*, No. 24-CV-20 (Door Cnty., Wis.).  That case has also been stayed pending this court's resolution of this case.  Dkt. No. 87, ¶ 55.

**THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT**

As noted above, RLUIPA prohibits a government agency from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government

11

demonstrates that imposition of the burden on that person, assembly or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). The Act defines "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." § 2000cc-5(5). RLUIPA applies where

> the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

§ 2000cc(a)(2)(C). The Act further states that it is to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3.

The Act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). It further provides: "The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." § 2000cc-5(7)(B). Relevant caselaw makes clear that limitations upon a religious organization's ability to expand and carry out activities beyond direct worship can also constitute a substantial burden on the religious exercise of a person, a religious assembly, or a religious institution.

In *World Outreach Conference Center v. City of Chicago*, for example, the Seventh Circuit considered whether the city's efforts to prevent a Christian sect from operating a community center

12

as a nonconforming use violated RLUIPA. 591 F.3d 531 (7th Cir. 2009). Addressing the question of whether the community center constituted "religious exercise" within the meaning of the Act, the court explained:

> The community center consists of a single building, which World Outreach bought from the YMCA in July 2005. The building is not a church as such. The premises mainly contain recreational and living facilities. But there is also space for religious services, and there is no doubt that even the recreational and other nonreligious services provided at the community center are integral to the World Outreach's religious mission, just as the rehabilitation centers operated by the Salvation Army are integral to the Salvation Army's religious mission . . . . Souls aren't saved just in church buildings.

*Id.* at 535 (citations omitted).

Similarly, in *Mintz v. Roman Catholic Bishop of Springfield*, the court found that that use of a proposed parish center for a church "falls well within the definition of 'religious exercise.'" 424 F. Supp. 2d 309, 319 (D. Mass. 2006). In so ruling, the court noted that the parish center "would house an office for religious education and would serve as a meeting place for the parish council. It would also be the locus of small gatherings related to church services, as well as other functions presently being performed in the rectory." *Id.* Although the parish had flourished for years without a new and expanded parish center, the court rejected the argument that this fact precluded a finding that barring the project imposed a substantial burden on religious exercise as RLUIPA defined it. Noting that the Act defines "land use regulation," in pertinent part, as "a zoning or landmarking law, or the application of such a law, that *limits or restricts* a claimant's use or development of land . . . ," 42 U.S.C. § 2000cc–5(5) (emphasis added), the court concluded that RLUIPA "certainly does not contemplate that a church's religious exercise can be frozen in place." *Mintz*, 424 F. Supp. 2d at 321. The court further explained that "what might have been adequate ninety years ago may not necessarily be adequate today. As time passes, the religious

13

needs of an institution can grow so large that the impinging nature of zoning laws may become much more burdensome." *Id.* at 322.

## ANALYSIS

In its motion for partial summary judgment, the Camp seeks the following relief:

1) Declaratory judgment that, to the extent that any terms of the second Conditional Use Permit (CUP) issued for the Center Project on January 9, 2024 are not in compliance with the Door County Comprehensive Zoning Ordinance, the Ordinance is pre-empted by RLUIPA and applicable federal law, and failure of the CUP to provide accommodations or exemptions from the Ordinance in relation to any such inconsistency would impose a substantial burden on the Camp's religious exercise in violation of 42 U.S.C. § 2000cc(a)(1)(A) and (B);

2) Declaratory judgment that all substantive and procedural rights and claims of any kind alleged or that might be alleged by individual Defendants under the Ordinance or state or federal law contrary to Plaintiff's rights and the requirements of RLUIPA and federal law as provided in the declaratory judgment requested in Paragraph 1 are pre-empted and foreclosed; and

3) Permanent injunctive relief barring enforcement of the Ordnance or state law contrary to Plaintiff's rights and the requirements of RLUIPA and ADA as provided in the declaratory judgment requested in Paragraph 1.

Dkt. No. 85. The County joins in the Camp's motion except to the extent it seeks such relief against the County. Since the County agrees with the Camp that denial of a permit for its Center would violate the Camp's rights under RLUIPA and has twice granted the Camp a CUP allowing the project to go forward, the County argues that there is no case or controversy between the Camp and the County and, thus, the court has no jurisdiction to grant declaratory relief against the County. The court agrees.

As to the remaining defendants, the Neighbors do not dispute that Camp Zion provides its services to carry out its church's religious mission by "providing Christ-centered outdoor experiences" for "both its own attendees and guests and other Christian ministries of like faith and practice." Dkt. No. 87, ¶ 2; Dkt. No. 102, ¶ 2; Dkt. No. 105, ¶ 2. Nor is there any dispute that

14

Door County qualifies as a "government" and its zoning and land use laws qualify as "land use regulations." Even on the issue of whether Camp Zion would be substantially burdened in its religious exercise if a permit was not granted, the Neighbors offer little if any argument.

"Substantial burden" is not defined by statute. Every regulation burdens exercise somehow, and "substantiality is a relative term—whether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question." *World Outreach Conf. Ctr.*, 591 F.3d at 539. However, "[t]hat [a] burden would not be insuperable would not make it insubstantial." *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005).

The Seventh Circuit has explained that recent United States Supreme Court decisions supplied a "standard much easier to satisfy" than the previously applicable "effectively impracticable" standard. *Jones v. Carter*, 915 F.3d 1147, 1149 (7th Cir. 2019) (first citing *Holt v. Hobbs*, 574 U.S. 352 (2015); then citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); and then citing *Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015)). "[T]he question is whether the conduct 'seriously violates' the individual or institution's religious exercise." *Immanuel Baptist Church v. City of Chicago*, 473 F. Supp. 3d 813, 817 (N.D. Ill. 2020) (citing *Schlemm*, 784 F.3d at 364). Further, in assessing a "substantial burden," the court can consider whether Camp Zion experienced "delay, uncertainty, and expense." *Id.* (first citing *World Outreach Conf. Ctr.*, 591 F.3d at 539; and then citing *Sts. Constantine & Helen Greek Orthodox Church, Inc.*, 396 F.3d at 901).

In their briefs on this motion, the parties dispute whether the Camp even needed a zoning variance and/or CUP in order to construct the Center at its current location. The Camp argues that the Center, including the pedestrian bridge spanning the drop-off, complies with the private road

setback requirements of DCCZO § 3.02 and even the large building setback requirements of DCCZO § 3.06. The Camp also contends that the Center as constructed meets the height requirements of DCCZO § 3.08. However, because the narrow issue before the court on this motion is whether the refusal to allow construction of the Center violates RLUIPA, which preempts local ordinances or Wisconsin law, the court need not undertake a detailed analysis or interpretation of the ordinances in question and whether the Center as built complies with each provision. It is sufficient to say that, even if there are departures from the ordinance's strict requirements, Camp Zion's entitlements under RLUIPA and the ADA preempt any state or local rules to the contrary and any such departures are therefore permissible.

Here, Camp Zion submitted expert testimony that outlined the difficulties the Camp underwent to design and develop the Center. First, the Project needed to intrude as little as possible on the large, open space on the east parcel, since outdoor recreation is central to its offerings. Dkt. No. 87, ¶¶ 16–20, 67, 125–36. Second, the Center needed to be sufficiently large to support Camp Zion's growing number of attendees safely and comfortably; Camp Zion's dated and cramped facilities necessitated the Center to begin with. *Id.* ¶¶ 16–19, 79, 130–31. The Center also needed to be relatively close to the other buildings servicing the Camp, since attendees would need to walk there for meals and other activities multiple times a day. Further, the Center's designer reduced the Center's size significantly below customary standards in an attempt to comply with the ordinance—reducing the Center's size even further would defeat the purpose of building the larger structure. *Id.* ¶¶ 16–19, 77–83. The parcel's topography makes building a sufficiently large building particularly challenging, especially when considering the required ADA accommodations and points of ingress and egress for older and less physically capable individuals. *Id.* ¶¶ 80–81, 92–94. The record before the court shows that strict adherence to the ordinances, as the Neighbors

interpret them, would made construction of the Center impossible at any location where it could meet the Camp's needs.

The court's reasoning in *Mintz* applies equally here—Camp Zion's needs have grown, and what might have been sufficient 30, 50, or even 80 years ago for its religious exercise is not sufficient anymore. The record before the court shows the delicate balancing act undergone by Camp Zion to build a sufficiently large (but still undersized for its capacity by professional standards) structure that minimally detracts from other aspects of the property key to its religious exercise, such as the open field and wooded areas, minimizes impact on roadside scenery, and provides access to individuals needing special accommodation under the ADA.

Even if other options were shown to be available (they were not), the court must also consider the resources available to the camp. Camp Zion's annual budget stays below $450,000, and financing the Center involved a 20-year capital campaign. *Id.* ¶¶ 132–35. At each administrative and judicial juncture, Camp Zion shouldered additional expenses to alleviate the Neighbor's concerns. Camp Zion's costs for the Center totaled over $5.5 million. *Id.* ¶ 125. And the record before the court reflects that moving the Center even further east, as Bahrke argued, would have both drastically increased the cost and failed to remedy any alleged conflicts with the ordinance. *See id.* ¶¶ 103–05, 108–18.

From the record before it, the court is satisfied that the evidence permits but one reasonable conclusion: refusing to allow the construction and use of the Center would impose a substantial burden on Camp Zion's exercise of religion and there is no compelling governmental interest to justify such refusal. Indeed, the Neighbors have offered no evidence to the contrary. They have asserted no more than their own private interest in preventing further expansion of the Camp, an

17

expansion the Camp has not even sought. The Camp's evidence bearing on its RLUIPA claim is essentially undisputed.

The Neighbors contend that the "most important facts which lay the basis for [their] response involve the illegal Settlement Agreement entered into between the Camp and the County." Dkt. No. 101 at 2. But the County's previous Settlement Agreement with the Camp is neither illegal nor is it relevant to the issue currently before this court. Under the terms of the Settlement Agreement, the County agreed that a zoning variance was not needed and that the County would immediately issue a CUP to allow the Camp to construct the Center in order to resolve the Camp's federal lawsuit against it. The state court vacated the CUP issued by the County not because the Settlement Agreement was illegal, but because the County failed to hold the public hearing state law required in order to issue a CUP. *Bahrke v. Door County Bd. of Adjustment*, 2024 WI App 74, ¶¶ 15, 25.

Moreover, the issue before this court is not whether the Camp needs a CUP or zoning variance to construct the Center, but whether it is entitled under RLUIPA to construct the Center whether or not the County issues a CUP, a zoning variance, or any other permit required under state or local law. What the Neighbors seem not to understand is that RLUIPA explicitly preempts state and local land use regulations that substantially burden religious exercise unless the regulations, as applied, are in furtherance of a compelling governmental interest. 42 U.S.C. § 2000cc(a)(1). As a result, they have failed to counter or even address the evidence the Camp has submitted that establishes the substantial burden that strict application of Door County's land use regulations for which the Neighbors advocate would impose on the Camp's religious exercise. Instead, the Neighbors devote a substantial portion of their response to discussing what the zoning

ordinances require and argue that the Camp has only itself to blame for the position in which it finds itself. Dkt. No. 101 at 5–7.

The Neighbors further contend that "the question before the court should be whether RLUIPA absolves the Camp from the need to *apply* for a variance, not whether a variance from the ordinances should be granted under RLUIPA." *Id.* at 7. In effect, it appears that the Neighbors are under the impression that claimants under RLUIPA are required to exhaust their state court remedies before they seek federal relief. But RLUIPA contains no such requirement. *See Church of Our Lord & Savior Jesus Christ v. City of Markham, Illinois*, 913 F.3d 670, 678 (7th Cir. 2019) (rejecting suggestion that "plaintiff must apply for a conditional use permit (as opposed to a parking variance) before bringing an RLUIPA claim").

To be sure, the Camp could have asserted its RLUIPA claim in state court proceedings since, under the Supremacy Clause, judges in every state are bound to enforce federal law. *See Printz v. Unites States*, 521 U.S. 898, 928–29 (1997) (noting that "state courts cannot refuse to apply federal law—a conclusion mandated by the terms of the Supremacy Clause (noting that "the Judges in every State shall be bound [by federal law]"). But it was not required to do so. Importantly, had it asserted its RLUIPA claim in state court and lost, the Camp's only avenue for federal relief would have been to petition the United States Supreme Court to grant *certiorari* review, a particularly difficult hill to climb. This would be its only avenue to federal review because the *Rooker-Feldman* doctrine generally bars lower federal courts from reviewing state court judgments. *Beth-El All Nations Church v. City of Chicago*, 486 F.3d 286, 294 (7th Cir. 2007) (citing *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983) and *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923)). The Camp clearly elected to avoid state court review of its RLUIPA claim.

Instead, the Camp chose to assert its RLUIPA claim in federal court on two separate occasions. Although it settled its first action without obtaining a judgment on the merits, the Camp does seek such a judgment in this case. And even though the Camp has asserted RLUIPA as a defense to the two state court lawsuits the Neighbors commenced after this case was filed, the state judges before whom each is pending have stayed those cases to allow this court to decide the central federal issue. Thus, neither *Rooker-Feldman*, nor principles of federal/state comity, bar this court from rendering a decision on the Camp's RLUIPA claim.

With the path to this court's review now clear and based on the undisputed material facts of the case, the court concludes that the Camp's motion for summary judgment should be granted. The evidence is undisputed and overwhelmingly shows that refusing to allow the construction and use of the Center would substantially burden the Camp's religious exercise. Neither the County nor the Neighbors have offered evidence or argument that preventing construction or use of the Center is justified by a compelling governmental interest. It follows that the Camp is entitled to the declaratory relief it seeks against the Neighbors, though perhaps in a different form. The Clerk will set this matter on the Court's calendar to discuss the form of declaratory relief to be awarded as well as further proceedings to address the Camp's remaining claims.

## CONCLUSION

For the reasons discussed above, Camp Zion's motion for partial summary judgment (Dkt. No. 85) is **GRANTED**.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of December, 2025.

_____
William C. Griesbach
United States District Judge